UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 13-00125 |
| | ) | Judge Sharp |
| [3] AARON L. OSBORNE | ) | |

**MEMORANDUM**

After a seven day trial and more than a day of jury deliberations, Defendant Aaron L. Osborne was convicted on Count Four of the Indictment (only one of the seven counts leveled against him), while his co-Defendant, Arvalon Michelle Harleston, was acquitted on the three counts she faced.[1]

Defendant Osborne has filed a Motion for Judgment of Acquittal (Docket No. 136) on his sole count of conviction. For the reasons that follow, his motion will be denied.

**I. Background**

Defendant Osborne was a full-time Recruiter for the Air National Guard stationed with the 118th Air Wing in Nashville, Tennessee. Defendants Andolsek and Harleston were Recruiting Assistants in a program called the Guard Recruiting Assistance Program ("G-RAP") that was administered by Document Packaging Broker, Inc. ("Docupak") pursuant to a contract with the Air National Guard.

The G-RAP program was designed to increase recruitment of Airmen into the Air National Guard by offering cash incentives for Recruiting Assistants who brought in recruits. Those

---

[1] The third Defendant, Max P. Andolsek, pled guilty before trial and testified as a prosecution witness.

1

incentives came in the form of a $1,000 payment when an Airman enlisted, and a second $1,000 payment when the Airman began basic training.

Payments were made by a $1,000 pre-loaded VISA card from Citibank that would be reloaded with an additional $1,000 once the Airmen commenced basic training. Those cards were issued after Docupak sent a request to Citibank, with payments made from Docupak's First Commercial Bank account. Docupak, in turn, would complete a requisition form[2] that was submitted to the Air National Guard requesting payment via an electronic funds transfer to its First Commercial Bank account.

To be entitled to the incentives, however, the Recruiting Assistants were supposed to be the ones who actually recruited an Airman. That is, they were supposed to identify and try to recruit individuals who were not already working with full-time Recruiters. Full time Recruiters, such as Defendant Osborne, were ineligible to participate in the G-RAP program because they were federal employee already paid to recruit.

Once a potential recruit was identified, the Recruiting Assistants would enter the recruit's information into the G-RAP website and make arrangements for the potential Airman and full-time Recruiter to meet. This was in accordance with a computer based training course that Recruiting Assistants were required to take. That course also instructed the Recruiting Assistants that, to be entitled to what effectively was a finder's fee, he or she had to be the first contact the potential Airman had with the Air National Guard. Moreover, the Recruiting Assistants were informed that they could not split the G-RAP payment with a full- or part-time Air National Guard Recruiter.

---

[2] The Indictment states that the form was a "U.S. Department of Defense DD Form 250, Material Inspection and Receiving Report." (Docket No. 1, Indictment at 3). While no such form was introduced at trial, Phillip Crane, the President of Docupak, testified that, even though he could not recall the precise title of the form utilized, Docupak submitted a government form in order to be reimbursed.

Defendant Osborne, being a Recruiter and not a Recruiting Assistant, did not take the online course.

The G-RAP program apparently was easily subject to abuse and a monumental failure overall.³ And, at least according to the Indictment, did not work as planned here, either.

The essence of the charges against Defendants Andolsek and Harleston was that, rather than going out into their own communities or using their own personal networks to find recruits, they would claim as recruits individuals who had already been in contact with Defendant Osborne. Defendant Osborne, it was claimed, would then receive a portion of the finder's fee for what the Government characterized as "piggyback" recruits.

Count Four, the sole count on which Defendant stands convicted, alleges that, from on or about December 18, 2006, until on or about September 15, 2009, he aided and abetted Defendant Andolsek in embezzling, stealing, purloining, or converting "a thing of value of greater than $1,000 from the United States Department of Defense" in violation of 18 U.S.C. § 641 and § 2. (Docket No. 1, Indictment at 11). The basis for this Count is that Defendant Andolsek "falsely and fraudulently stated and represented that approximately 18 PA's [Potential Airmen] had been recruited by him in compliance with" the G-RAP program when, "in truth and fact," they had not been so recruited. (Id. at 11). As a result of this conduct, Defendant Andolsek and Osborne allegedly caused the Department of Defense to reimburse Docupak approximately $9,000 for payments made to Defendant Andolsek.

---

³ See, ArmyTimes, "25 More Charged in Guard Recruiting Conspiracy, Fraud, http://www.armytimes.com/story/military/crime/2015/10/22/25-more-charged-guard-recruiting-conspiracy-fraud/74411758; ABC News, "National Guard Recruiting Fraud May Be As Hight As $50 Million," http://abcnews.go.com/blogs/politics/2014/02/national-guard-recruiting-fraud-may-be-as-high-as-50m/; CBS News, "Hundreds of Army Soldiers Investigated for Recruiting Kickback Scheme, http://www.cbsnews.com/news/hundreds-of-army-soldiers-investigated-for-recruiting-kickback-scheme/ (Websites last visited on March 31, 2016).

## II. Standard of Review

In determining whether a motion for a judgment of acquittal should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)).

## III. Application of Law

Defendant presents two arguments in relation to his Motion for Judgment of Acquittal. First, he argues that the Government failed to establish the essential elements of the substantive crime underlying the aiding and abetting charge as set forth in Count Four. Second, he claims that the guilty verdict on Count Four is improper in that it contradicts the acquittals rendered on various of the other counts on which he was acquitted.

### A. Theft of Government Property – 18 U.S.C. § 841

Section 641 of Title 18 provides in pertinent part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof;

>           *                *                *
> Shall be fined under this title or imprisoned[.]

18 U.S.C.A. § 641. "The federal aiding and abetting statute, 18 U.S.C. § 2, states that a person who furthers – more specifically, who 'aids, abets, counsels, commands, induces or procures' – the commission of a federal offense 'is punishable as a principal.'" Rosemond v. United States, 134 S. Ct. 1240, 1245 (2014).

Therefore, to convict for the crime of theft under Section 641 the Government has the burden of proving beyond a reasonable doubt "that defendant (1) knowingly (2) stole or converted to the use of another (3) something of value of the United States." United States v. Forman, 180 F.3d 766, 769 (6th Cir. 1999). "To prove aiding and abetting, the Government must show: (1) an act by the defendant that contributes to the commission of the crime; and (2) the defendant's intent to aid in the commission of the crime." United States v. Baird, 403 F. App'x 57, 64 (6th Cir. 2010) (citing United States v. Bronzino, 598 F.3d 276, 279 (6th Cir. 2010)).

Defendant argues that the Government did not prove a violation of Section 641 because it did not show the theft or "something of value of the United States." If anything, Defendant insists, the Government showed theft from Docupak, which would not be a federal crime.

In United States v. Hall, 549 F.3d 1033 (6th Cir. 2008), the Sixth Circuit observed that its prior case law "discerned four types" of violations under Section 641:

> (1) where the stolen property clearly belongs to the government and federal jurisdiction is undisputed; (2) where the federal government, or one of its agents, acts as a custodian or bailee of property, so that the transitory possession makes it the property of the United States; (3) where property that originated with the federal government passes to private hands, but the government retains sufficient control so that the funds remain federal property; and (4) where a government employee or agent has received property but fails to convey it to the United States and the question is whether the funds acquired the status of government property.

5

Id. at 1038 (citing United States v. Klingler, 61 F.3d 1234, 1238 (6th Cir. 1995)). This case falls into the third category. Defendant claims that the Government's case fails for lack of showing that the government retained sufficient control over the funds (via the credit card) that were used to pay Defendant Andolsek.

In support of his position, Defendant relies primarily on portions of Crane's testimony. He also discusses at length Hall and the in-circuit and out-of-circuit cases on which it relied, including United States v. Foulkes, 905 F.2d 928 (6th Cir. 1990); United States v. McKay, 274 F.3d 755 (2nd Cir. 2001); United States v. Johnson, 596 F.2d 842 (9th Cir. 1979); and United States v. Littriello, 866 F.2d 713 (4th Cir. 1989).

Defendant argues "that the government had essentially no oversight or control over the G-RAP program that Docupak ran," a point he claims was confirmed by Crane, its President. (Docket No. 136 at 6). In his testimony, Crane stated that part of the payments Docupak received from the Department of Defense for running the G-RAP Program was a fee of $345 per recruit. Docupak would retain that fee, even if it determined that the fee was improper, and its relationship with the Air National Guard would continue unabated. For example, Docupak paid Defendant Harleston for recruits who had first had contact with Defendant Osborne; when Docupak chose to take no corrective action against Harleston, it still kept the $345 fee.

Further, the Recruiting Assistants were independent contractors who reported to Docupak. Any issues were reported to Crane, and he or Docupak – not the Government – would address the issue. It was also Docupak, and not the Government, that audited submissions by the Recruiting Assistants. Moreover, there were no federal statutes or regulations that governed the G-RAP program. The situation was, as Defendant puts it, "a closed loop that the government was not a part

6

of." (Docket No. 136 at 6).

As for Hall and the cases on which it relied, Defendant acknowledges that all found that the Government had been deprived of a "thing of value," but correctly claims they did so on an entirely different factual record. He points out that in Hall, a case involving a third party and subcontractors to the Oak Ridge National Laboratory, the third party "was required to demonstrate that it had an accounting system in place that could adequately track its projects and segregate its costs," and its "accounting software satisfied these requirements" by "tracking every cost incurred" and allowing the third party's accountant to provide it with a "monthly summary comparing the interim reimbursements received with actual indirect costs incurred." Hall, 549 F.3d at 1039. Additionally, each subcontract issued by the third party included

> (1) a term requiring that [the third party] acknowledge that it was being reimbursed by the prime contractor with funds advanced from the Department of Energy; (2) a term requiring that the interim reimbursement funds be used only for costs that were reasonable, allocable and actually incurred, in accordance with [federal regulations]; (3) a term stating that [the third party's] final indirect cost rates were governed by [federal regulations]; (4) a term requiring that [the third party] be subject to records inspection and audit by the United States Comptroller General and the Department of Energy related to any transaction arising from the subcontract; and (5) a term requiring that [the third party] return to the Department of Energy any interim reimbursements advanced, but not incurred, for overhead costs.

Id. at 1040.

As for the other cases discussed in Hall, the following quotes from Defendant Osborne's opening brief adequately set forth his position:

> • The Hall court noted, for example, that where a third party is "'required to report back to the federal agency, and any unused funds or misused funds were to be returned to the federal agency,'" then "'those funds retain their federal character even though deposited into accounts of non-federal agencies.'" [Hall quoting Foulkes]

> • Likewise, the Hall court agreed with a Second Circuit opinion [McKay] holding

7

> that funds could retain their federal character when the government proved two conditions: (1) the government agency "required [the third party] to comply with its regulations when administering the [government] program," and (2) the agency required that the third party have explicit contracts with its contractors that they "comply with the federal regulations as a condition of receiving [funds]."
>
> • The Hall court further relied on a Ninth Circuit case [Johnson], which addressed payments from the Department of Housing and Urban Development to the San Francisco Redevelopment Agency  Hall [and] held that the government retained "supervision and control" over the HUD funds because "federal regulations required the agency to maintain detailed financial records, file annual financial and progress reports, and adopt government-prescribed financial management systems."
>
> • Hall finally cited to a Fourth Circuit case [Littriello which] found that funds paid to a Postal Worker health plan retained their federal character because "federal regulations required the health plan to establish a special reserve fund, invest and credit all interest to the fund, keep detailed records relating to the financial status of the fund, furnish an annual accounting of its operations to [the government], and submit to audits by [the government]."

(Docket No. 136 at 11-14, internal citations omitted).

Unlike Defendant, the Court does not read Hall as defining "the outer limits of what can constitute 'federal property'" (id. at 11) for purposes of Section 641. Rather, Hall discussed the types of evidence that were found sufficient to establish that funds were a "thing of value" to the United States. Moreover, Defendant circumscribes Crane's testimony.

Given that "this Court views the evidence in the light most favorable to the prosecution and gives the prosecution the benefit of all reasonable inferences from the testimony," United States v. Abboud, 438 F.3d 554, 589 (6th Cir. 2006), and further given that "the relevant question" is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson, 443 U.S. at 319 (emphasis in original), "[a] defendant 'bears a very heavy burden' in a sufficiency of the evidence challenge," United States v. Clay, 667 F.3d 689, 693 (6th Cir. 2012) (citations omitted). Defendant Osborne has not met that burden.

When the facts are construed in the Government's favor, a reasonable jury could have found that the finder fees paid in this case were a "thing of value" to the United States.

Prior to its relationship with the Air National Guard and the Department of Defense, Docupak was not in the business of military recruiting. Rather, it was primarily a marketing and fulfillment company that became involved in the G-RAP program because it was hired for that very purpose by the Government. That is, the Department of Defense created the G-RAP program and Docupak executed it.

Crane testified that Docupak received federal funds to run the G-RAP program. More specific to this case, he testified that Docupak paid the finders fees to the Recruiting Assistants out of it own pocket first and then submitted invoices to the federal government which reimbursed those funds. Further, Crane testified that the $345 paid to it for each recruit was paid for by the government. Such evidence shows that money flowed directly from the Government to Docupak to carry out the G-RAP program that was developed by the Department of Defense, or so a jury could reasonably conclude.

Crane and other witnesses testified that the Government placed restrictions on how G-RAP funds could be used. For example, Recruiting Assistants were explicitly instructed that they were not to share their bonuses with Recruiters or potential Airmen, that doing so amounted to theft, and that all parties involved faced penalties for violation of this rule. As the Government points out, the potential penalties that could be imposed (including possible separation from service) suggests that "DOD considered the bonuses to be federal money." (Docket No. 141 at 4).

Moreover, an Order for Supplies or Service dated September 24, 2007 was introduced as a defense exhibit by Defendant Harleston. While that document is unsigned, Crane identified it as

9

what he characterized as a "task order," and acknowledged that it was representative and typical of the contracts entered into yearly that governed the relationship between Docupak and the Air National Guard.[4] That document lays out in detail the relationship between the Government and Docupak and shows control by the former.

A "critical factor in the success of the GRAP" program was "[t]he management of RA funds," and Docupak assured the government that it would "process the RA payments in an efficient manner with effective financial controls[.]" (Def. Exh. 2 at 9 & 10). A specific line item in the award funded the Recruiting Assistants bonuses, with Docupak required to "account for the payment[,]" and relied on government furnished information to determine who was eligible for those bonuses. (Id. at 2 & 21).

Further, the "task order" contemplated "ongoing discussions" between "Docupak leadership" and "ANG leadership." (Id. at 18). A National Guard "Contract Specialist" was designated, as was a "Contracting Officer's Representative" who was tasked with "monitoring the progress and quality of [Docupak's] performance." (Id. at 13). Additionally, Docupak was required to submit monthly, quarterly and annual reports to the Department of Defense, and agreed to comply with other mandatory reporting requirements as mandated by the Secretary of the Army and his designee.

Very recently, the United States District Court for the District of Guam was presented with a Motion for Judgment of Acquittal in a G-RAP case that raised virtually the same arguments as those presented here. In rejecting those arguments, the court wrote:

> In the present case, evidence was presented that the government had an ownership interest in the money disbursed to the Defendant. Mr. William Stewart ("Mr.

---

[4] Crane also testified that the contractual relationship between Docupak and the Air National Guard began in 2006 and continued until 2010.

Stewart"), Deputy Program Manager for Docupak, testified at trial that the National Guard approached Docupak to create a program to recruit soldiers, and worked closely with Docupak to develop the program. Docupak and the National Guard then entered into an agreement to run G-RAP. As part of the agreement, Mr. Stewart testified that Docupak made payments to successful RAs. After successful accessions or individuals shipping to basic training, Docupak invoiced the National Guard. The National Guard would then send money to Docupak. These facts prove that the funds disbursed to the Defendant were a "thing of value" belonging to the government within the meaning of § 641. . . .

Furthermore, there was evidence that the government maintained substantial control over the funds. In finding that the government suffered a loss of a thing of value under § 641, the "key factor" is the supervision and control over the thing of value contemplated and manifested on the part of the government. United States v. Johnson, 596 F.2d 842, 846 (9th Cir. 1979)[.]

In the present case, the "Solicitation, Offer and Award" between the Army National Guard, National Guard Bureau Contracting Office and Docupak was admitted into evidence. The Contract contains provisions for supervision, control and approval of Docupak's activities. Docupak was required to submit a plan to follow the Federal Government's small business participation goals to maximize small business subcontractor and vendor participation in the Contract. Docupak was also required to submit a Subcontracting Report and Summary Subcontracting Report to the Administrative Contracting Officer. On a contract-by-contract basis, Docupak was also required to submit subcontractor information to the U.S. Government.

The National Guard Bureau also required the submission of periodic reports, studies and surveys by Docupak to determine the extent of compliance of the Small Business Subcontracting Plan. Finally, Docupak was also required to submit a Quality Control Plan to the National Guard Bureau, which included the reporting and tracking of actions to ensure the effectiveness of the contract.

United States v. Constantino, 2016 WL 1170940, at *2-3 (D. Guam Mar. 23, 2016).

The Court agrees with the foregoing rationale, even though, quite obviously, the evidence presented to the jury in this case was not exactly the same. In fact, the evidence presented at trial was not what one would normally expect in a case alleging that stolen funds were Government property.

The Government could have (and likely should have) submitted the actual signed contract

that governed the relationship between Docupak and the Air National Guard. The introduction of a couple of DD Form 250s would have been helpful as well. But the question is not what was submitted. Rather the question is whether there was sufficient evidence from which a jury could conclude the payments made to Defendant Andolsek were a thing of value to the United States. The Court finds that there was given the limited standard of review applicable to a Motion for Judgment of Acquittal. Indeed, as the Government posited rhetorically, "how could monies paid by DOD to a contractor selected by DOD for services which DOD will directly benefit [from] be anything but a 'thing of value' for the DOD?" (Docket No. 141 at 6).

**B. Inconsistent Verdicts**

"'The Supreme Court has repeatedly held that a jury may announce inconsistent verdicts in criminal cases.'" United States v. Lawrence, 555 F.3d 254, 261 (6th Cir. 2009) (quoting United States v. Clemmer, 918 F.2d 570, 573 (6th Cir. 1990)). It did so in Dunn v. United States, 284 U.S. 390 (1932), and reiterated that conclusion in United States v. Powell, 469 U.S. 57 (1984). The rationale for such holdings stems from the fact that "[i]t is unclear whose ox has been gored," Powell, 469 U.S. at 65, inasmuch as "'[a] jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other,'" Lawrence, 555 F.3d at 261-62 (quoting United States v. Johnson, 223 F.3d 665, 675 (7th Cir. 2000)).

In light of Dunn and Powell, the Sixth Circuit has "repeatedly recognized that inconsistent verdicts in a criminal case generally are not reviewable." United States v. Randolph, 794 F.3d 602 610 (6th Cir. 2015) (citing United States v. Smith, 749 F.3d 465, 498 (6th Cir. 2014)). This rule, however, is subject to two exceptions:

> First, where jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality," we have opined that "relief may be warranted." . . . Second, in a situation "where a guilty verdict on one count necessarily excludes a finding of guilt on another," i.e. a "mutually exclusive" verdict, this court can review the defendant's challenge to the verdict.

Id. at 610-11 (internal citations omitted).

Here, Defendant argues that "this case falls more plainly under the second exception: the verdicts are mutually exclusive." (Docket No. 136 at 16). While that may be so, the Court does not agree with his ultimate conclusion that a Judgment of Acquittal should be entered based on inconsistent verdicts.

The Sixth Circuit has observed that the "mutually exclusive" exception "contemplate[s] a situation in which a defendant receives two guilty verdicts that are logically inconsistent, for example if a jury convicted a defendant of both larceny and embezzlement based on the same underlying conduct." United States v. Ruiz, 386 F. App'x 530, 533 (6th Cir. 2010). Some courts have "interpreted [this] exception to narrowly apply to only 'those situations where a jury has convicted a defendant of two crimes and those convictions are mutually exclusive' or, put differently, where the defendant was 'convicted of two crimes, at least one of which he could not have committed.'"
United States v. Maury, 695 F.3d 227, 265 (3rd Cir. 2012) (citation omitted). Of course, an "obvious distinction," Ruiz, 386 F. App'x at 533, occurs where, as here, the Defendant was convicted on one count but acquitted on others. Regardless, and assuming the exception even applies in the present scenario, Defendant cannot benefit from it.

In this regard, the Court rejects Defendant Osborne's argument that "[t]he conviction on Count 4 is mutually exclusive with the acquittal on Count 2, and the acquittals on Counts 6 and 7

13

help demonstrate this." (Docket No. 136 at 17). In Count 2, Defendant was charged with conspiring with Defendant Andolsek to steal form the United States and make false statements; in Counts Six and Seven he was charged with aiding and abetting Defendant Andolsek in making false statements.

There is a commonality between Counts Four, Six, and Seven in that they charge aiding and abetting, but the underlying crimes are different – theft of government property in the former, and making false statements in the latter two. Similarly, while Counts Two and Four have some commonality in the sense that in both theft of government property is charged, the basis for the charges are different: the former alleges conspiracy, while the latter alleges aiding and abetting. Theft of government property requires proof of different elements than does making a false statement, just as the elements for a conspiracy charge are different than an aiding and abetting charge. See, United States v. Stetler, 526 F. App'x 631, 635 (6th Cir. 2013) (stating that where "crimes alleged in each count require proof of entirely different elements . . . acquittal of one does not necessarily render conviction of the other inconsistent"); United States v. Hudson, 49 Fed. App'x 79, 80 (7th Cir. 2002) (stating that "inconsistent verdicts are permissible in criminal cases" but that where "two offenses have different elements" contrasting verdicts are not inconsistent); United States v. Latimer, 780 F.2d 868, 871 (10th Cir. 1985) (holding that different verdicts on crimes that "involve proof of different elements" are "not necessarily inconsistent" and that "[i]n all events . . . each count of an indictment constitutes a separate offense, and consistency in the verdict is not required").

Moreover, Counts Two and Four, which Defendant contends to be the most closely aligned, charged different underlying facts. The overt acts underlying the conspiracy charge relate only to

the recruiting of "J.J" and "J.S." In contrast, Count Four alleged aiding and abetting in relation to "approximately 18 PA's". It could be that the jury concluded there was no agreement reached between Defendants Andolsek and Osborne regarding "J.J." and "J.S," but that Defendant Osborne aided and abetted Defendant Andolsek in relation to other potential recruits. Or, it could be that the jury decided to acquit on some counts "out of compassion or compromise or because 'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity,'" which it was permitted to do. Standefer v. United States, 447 U.S. 10, 22 (1980) (quoting, Dunn, 284 U.S. at 393. Either way, Defendant has not shown his conviction on Count Four was infirm.

## IV. Conclusion

For the reasons set forth above, Defendant Osborne's Motion for Judgment of Acquittal will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE